UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| THOMAS A. RUSSOMANO | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-CV-10077-ADB |
| | ) | |
| NOVO NORDISK INC. | ) | |
| | ) | |
| Defendant. | ) | |

**<u>Memorandum in Opposition to Motion for a Temporary Restraining Order</u>**

**TABLE OF AUTHORITIES**

Page

CASES

*4 MVR, LLC v. Warren Hill Const. Co., Inc.*,
 No. 12-10764, 2012 WL 3016223 (D. Mass. July 23, 2012) .................................................16

*Alexander & Alexander, Inc. v. Danahy*,
 21 Mass. App. Ct. 488, 488 N.E.2d 22 (1986) .................................................................17

*American Century Home Fabrics, Inc. v. Ashley Furniture Indus., Inc.*,
 473 F. Supp. 2d 168 (D. Mass. 2007) .........................................................................5

*Astro-Med, Inc. v. Nihon Kohden Am., Inc.*,
 591 F.3d 1 (1st Cir. 2009).................................................................................3

*Bio-Imaging Techs., Inc. v. Marchant*,
 584 F. Supp. 2d 322 (D. Mass. 2008) ...................................................................16

*Biogen Idec MA Inc. v. Trustees of Columbia Univ.*,
 332 F. Supp. 2d 286 (D. Mass. 2004) ...................................................................16

*Braintree Labs., Inc. v. Citigroup Global Mkts. Inc.*,
 622 F.3d 36 (1st Cir. 2010).................................................................................5

*Brooks Automation, Inc. v. Blueshift Techs., Inc.*,
 No. 05-cv-03973-BLS2, 2006 WL 307948 (Mass. Super. Ct. Jan. 17, 2006,
 Gants, J.) ............................................................................................7, 9, 10

*Bushkin Assocs., Inc. v. Raytheon Co.*,
 393 Mass. 622, 473 N.E.2d 662 (1985) .............................................................2, 6

*Charlesbank Equity Fund II v. Blinds To Go, Inc.*,
 370 F.3d 151 (1st Cir. 2004).........................................................................16, 17

*Contrast A.R.S. Servs., Inc. v. Morse*,
 31 Mass. 227, 2013 WL 2152181 (Mass. Super. Ct. Apr. 5, 2013) .........................................4

*Coskey's Television & Radio Sales and Service, Inc. v. Foti*,
 253 N.J. Super. 626 (App. Div. Feb. 19, 1992) ....................................................15

i

*De Long Corp. v. Lucas*,
    278 F.2d 804 (2d Cir. 1960).................................................................................9

*Edwards v. Athena Capital Advisors, Inc.*,
    23 Mass. L. Rptr. 155, 2007 WL 2840360 (Mass. Super. Ct. 2007) ....................14, 15, 19, 20

*Elizabeth Grady Face First, Inc. v. Escavich*,
    321 F. Supp. 2d 420 (D. Conn. 2004).................................................................12

*Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*,
    445 F.3d 13 (1st Cir. 2006)..............................................................................5

*F.A. Bartlett Tree Expert Co. v. Barrington*,
    353 Mass. 585, 233 N.E.2d 756 (1968) ..........................................................3, 7

*Foodmark, Inc. v. Alasko Frozen Foods, Inc.*,
    2013 WL 1285539 (D. Mass. Mar. 26, 2013)......................................................2

*Genzyme Corp., et al. v. Keith Hanglin and BioMarin Pharm., Inc.*,
    No. 19:84-cv-03502-BLS2 (Mass. Super. Ct. Nov. 19, 2019) ...............................19

*Inner-Tite Corp. v. Brozowski*,
    27 Mass. L. Rptr. 204, 2010 WL 3038330, at *13 (Mass. Super. Ct. Apr. 14,
    2010). ........................................................................................................6

*Iron Mountain Info. Mgmt., Inc. v. Taddeo*,
    455 F. Supp. 2d 124 (E.D.N.Y. 2005) ...............................................................7

*Lombard Med. Tech., Inc. v. Johannessen*,
    729 F. Supp. 2d 432 (D. Mass. July 2, 2010) ...............................................12, 13

*New Comm Wireless Servs., Inc. v. SprintCom, Inc.*,
    287 F.3d 1 (1st Cir. 2002)............................................................................8, 9

*Nieves-Marquez v. Puerto Rico*,
    353 F.3d 108 (1st Cir. 2003)...........................................................................5

*NPS, LLC v. Ambac Assurance Corp.*,
    706 F. Supp. 2d 162 (D. Mass. 2010) ..............................................................2

*Packaging Indus. Group, Inc. v. Cheney*,
    380 Mass. 609, 405 N.E.2d 106 (1980) ..........................................................18

*R.E. Moulton, Inc. v. Lee*,
  18 Mass. L. Rptr. 157, 2004 WL 1894910, at *1 (Mass. Super. Ct. June 17,
  2004) ...........................................................................................................................3, 7

*Routhier Placement Specialists, Inc. v. Brown*,
  15 Mass. L. Rptr. 246, 2002 WL 31248032, at *2 (Mass. Super. Ct. Sept. 26,
  2002). ..............................................................................................................................15

*Ruggieri v. M.I.W. Corp.*,
  826 F. Supp. 2d 334 (D. Mass. 2011) ..........................................................................16

*Shipley Co. v. Clark*,
  728 F. Supp. 818 (D. Mass. 1990) ..................................................................................5

*Sierra Club v. Larson*,
  769 F.Supp. 420 (D. Mass. 1991) .................................................................................16

*Sodexo Operations, LLC v. Abbe*,
  382 F. Supp. 3d 162 (D. Mass. 2019) ........................................................................3, 6

*Steranko v. Inforex, Inc.*
  5 Mass. App. Ct. 253, 362 N.E.2d 222 (1977) ...............................................................6

*Whitmyer Bros., Inc. v. Doyle*,
  58 N.J. 25, 274 A.2d 577 (N.J. 1971) ...........................................................................13

## OTHER AUTHORITIES

21 C.F.R. 202.1(e)(6)(ii) ...........................................................................................................18

Restatement (Second) of Conflict of Laws § 187 (1971) ...........................................................6

Thomas Russomano filed this action because Novo Nordisk, Inc. ("Novo") refused to confirm, as the facts set forth in his declaration establish, that he has no non-compete obligation to Novo. Instead, Novo seeks to enforce the terms of an agreement Russomano signed in 2016 (the "2016 Agreement"), (Dkt. No. 7-2), two years before Novo eliminated his position and offered him a job with (a) different responsibilities, (b) a different geographic scope, and, most significantly, (c) lower compensation. Russomano, who is himself a hemophiliac, accepted the demotion so that he could maintain a steady income and provide for his family; he was never asked to sign a new non-compete. (Declaration of Thomas Russomano, ¶¶2, 25 ("TR Dec. ¶__").)

Novo has no legitimate interests to protect in this case. As a life-long hemophilia patient, he carried knowledge about the hemophilia patient community with him to Novo and he is entitled to carry it out. While Novo's counsel was apparently working over the weekend preparing its Motion, Russomano was in Phoenix, where, in his volunteer role as lead counselor for the Adventure Club of the New England Hemophilia Association's Family Camp, he and the camp director presented a workshop on how other camps for kids with blood disorders around the country can develop Adventure Infusion Programs. *Id.*, ¶16. Before he ever even applied to work at Novo, he served as a Board Member at the Hemophilia Federation of America for six years, and in various positions, including 1st Vice President, of the Hemophilia Association of New Jersey for eleven years prior to his employment by Novo, winning an award for service in 2016. *Id.*, ¶17.

Even if the 2016 Agreement was resurrected and applied to Russomano, no injunctive relief is appropriate because Novo can neither establish a likelihood of success on the merits nor irreparable harm. On the contrary, the balance of any harm falls squarely on Russomano's shoulders. Finally, although Novo dramatically characterizes the loss of three employees as a

"raid," the fact is that it made no attempt to enforce its claimed non-compete against one of those employees, and its own managers advised against pursuing enforcement against Russomano.[1]

## I.     The 2016 Agreement is Not Enforceable.

Although the 2016 Agreement purports to require the application of New Jersey law, Massachusetts law applies to the threshold question of whether that agreement has any legal effect.  The 2016 Agreement's choice-of-law provision does not apply to the validity of the contract's formation; therefore "Massachusetts choice of law rules will directly determine which state's law does apply."  *NPS, LLC v. Ambac Assurance Corp.*, 706 F. Supp. 2d 162, 168 (D. Mass. 2010); *accord Foodmark, Inc. v. Alasko Frozen Foods, Inc.*, 2013 WL 1285539, at *8 (D. Mass. Mar. 26, 2013) ("It would be odd to apply a contractual choice-of-law clause when determining whether any part of the contract is valid in the first instance.").

Massachusetts uses "a 'functional choice-of-law approach,' which focuses on 'the interests of the parties, the States involved, and the interstate system as a whole.'" *NPS*, 706 F. Supp. 2d at 168 (quoting *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 631, 473 N.E.2d 662 (1985)).  The "guiding principle" in this determination is the identification of the state with the most significant relationship to the transaction and the parties.  *Id.*  Here, that state is obviously Massachusetts.

Russomano moved to Massachusetts in 2016 at Novo's request to perform services in Massachusetts.  TR Dec. ¶9.  He has lived here ever since, including both times Novo laid him off.  *Id.*  In 2018, when his position was eliminated, he both lived and worked in Massachusetts,

---

[1] Novo has systematically reduced its own salesforce, from about 45 in 2016 to only about 30 today.  TR Dec. ¶40 Novo is apparently convinced that Jim Stephens, a former employee of Novo who was terminated by BioMarin within days of joining the company, recruited Russomano.  This is simply untrue.  TR Dec. ¶31; Declaration of John Cones, ¶28.

and he accepted his new job, with its concomitant cut in responsibility and pay, in Massachusetts. *Id.*, ¶¶19-25.

In Massachusetts, when an employer changes an employee's job, it extinguishes any existing non-compete, and must obtain a new commitment from the employee. As the First Circuit put it, "under Massachusetts law, '[e]ach time an employee's employment relationship with the employer changes materially such that they have entered into a new employment relationship a new restrictive covenant must be signed.'" *Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 16 (1st Cir. 2009) (citing *F.A. Bartlett Tree Expert Co. v. Barrington*, 353 Mass. 585, 233 N.E.2d 756 (1968)); *see also Sodexo Operations, LLC v. Abbe*, 382 F. Supp. 3d 162, 165 (D. Mass. 2019) (denying injunction where employee alleged changes in compensation and job responsibilities and absence of reference to old non-compete in new offer letter); *R.E. Moulton, Inc. v. Lee*, 18 Mass. L. Rptr. 157, 2004 WL 1894910, at *1 (Mass. Super. Ct. June 17, 2004) (denying request for a preliminary injunction based on a non-compete agreement where employee's position and compensation changed, but no new agreement was signed and the employer did not notify the employee that he was still subject to the non-compete clause).

There is no serious dispute that the position covered by the 2016 Agreement was eliminated by Novo in 2018. On June 20, 2018, Russomano lived in Boston and was a Hemophilia Therapy Manager I, New England. TR Dec. ¶¶16-18. He was responsible for interfacing with patients, chapter organizations, specialty pharmacies, and prescribers and non-prescribers in Hospitals and Hemophilia Treatment Centers. *Id.* That day, Novo informed him in writing that his position had been eliminated and explained his severance benefits. *Id.*, ¶19; Ex. B.

On July 6, 2018, Novo offered Russomano a new job as Senior Hemophilia Community Liaison—New York, NY. *Id.*, ¶20. His offer letter (TR Dec. Ex. C) did not mention the 2016 Agreement or any non-compete obligations whatsoever, and the 2016 Agreement made no reference to other, new positions at Novo. *Contrast A.R.S. Servs., Inc. v. Morse*, 31 Mass. L. Rptr. 227, 2013 WL 2152181, at *4 (Mass. Super. Ct. Apr. 5, 2013) ("[t]he terms and conditions of this Agreement and its enforceability shall continue to apply and be valid notwithstanding any change in [Morse's] duties, responsibilities, position or title with [ARS]…"). The new position changed Russomano's job entirely: he reported to a new manager through a different channel; he now had to commute to New York for significant periods of time; he no longer had responsibility for interfacing with prescribers and non-prescribers in Hospitals or Hemophilia Treatment Centers; and most significantly, his incentive compensation decreased from $43,000 to $30,000. *Id.*, ¶¶19-24. The position was indisputably a demotion, but Russomano had a two-year-old child and felt compelled to maintain a steady income. *Id.*, ¶25.[2]

In January 2019, Novo changed Russomano's job again, adding New Jersey to his territory, which already encompassed New York, and changed his title to Senior Hemophilia Community Liaison—New England. *Id.*, ¶26. In April 2019, Novo added the title and responsibilities of Area Field Trainer to Russomano's portfolio of responsibilities, but again did not adjust his compensation. *Id.*, ¶28. Through all of these changes, he was never asked to sign a new non-compete, even though Novo, which obtained a new non-compete when Russomano's position was eliminated the first time in 2016, knew one was required. *Id.*, ¶¶22, 27, 29. In

---

[2] Novo concedes Russomano did not sign new non-compete when he was demoted. (Answer, Dkt. No. 7, ¶¶37, 38). Instead, it describes his lay-off rehiring in a new position with new responsibilities, a new geographic scope, and reduced compensation as follows: "In June 2017, Russomano transferred back to the New England territory before accepting an HCL position in New York in August 2018, educating patients and caregivers about Novo Nordisk's hemophilia treatments, as he had done as a Hemophilia Community Specialist in 2016." (Dkt. No 11, p. 7).

short, the parties have no non-compete agreement, and this Court should decline to intervene and resurrect an agreement signed in connection with a position that no longer exists.

## II.     Even If the 2016 Agreement Is In Force, No Injunction is Required.

This Court must employ a four-factor analysis in evaluating Novo's request for a preliminary injunction. Those factors are: "(1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006) (internal quotation marks omitted).  The court must "measure irreparable harm on a sliding scale, working in conjunction with [Novo's] likelihood of success on the merits . . . such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." *Braintree Labs., Inc. v. Citigroup Global Mkts. Inc.*, 622 F.3d 36, 42-43 (1st Cir. 2010) (internal quotations and citation omitted).  Novo bears the burden of satisfying each of these elements. *See Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003).  When there are significant disputes of fact, Courts in Massachusetts generally deny preliminary relief. *American Century Home Fabrics, Inc. v. Ashley Furniture Indus., Inc.*, 473 F. Supp. 2d 168, 175 (D. Mass. 2007).

### A.     Massachusetts Law Applies in this Case.

Even if the Court finds that the 2016 Agreement is enforceable against Russomano, Massachusetts choice-of-law principles still require application of Massachusetts law.  In a diversity case, a federal court "must apply the choice-of-law rules of the forum state." *Shipley Co. v. Clark*, 728 F. Supp. 818, 825 (D. Mass. 1990).  Massachusetts courts take a "functional

choice-of-law approach that responds to the interests of the parties, the States involved, and the interstate system as a whole." *Sodexo Operations*, 382 F. Supp. 3d at 164 (quoting *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622 (1985). In Massachusetts, the courts will uphold the parties' expressed specific intent as to the governing law, as long as the result is not contrary to public policy. *Steranko v. Inforex, Inc.* 5 Mass. App. Ct. 253, 362 N.E.2d 222, 228 (1977) (citing Restatement (Second) of Conflict of Laws § 187 (1971)). Where the law chosen by the parties is contrary to a fundamental public policy of a state with a materially greater interest in the transaction and whose law would have governed absent any choice-of-law provision, the court will apply the law of the state with the materially greater interest in the transaction. *Inner-Tite Corp. v. Brozowski*, 27 Mass. L. Rptr. 204, 2010 WL 3038330, at *13 (Mass. Super. Ct. Apr. 14, 2010).

Here, the state with the materially greater interest is undoubtedly Massachusetts. Russomano relocated his family to Massachusetts in February 2016, where he moved at Novo's insistence. He has lived here ever since, including both times Novo laid him off. In 2018, when his position was eliminated and the 2016 Agreement therefore became void, he both lived and worked in Massachusetts. Russomano will perform the work he does for BioMarin in Massachusetts. Thus, no other state, including New Jersey, has an interest in the resolution of this dispute that is materially greater than that of the Commonwealth.

Further, enforcement of the 2016 Agreement against Russomano would be contrary to the public policy of Massachusetts. Through a long history of decisions, Massachusetts courts have demonstrated a policy against enforcing agreements restraining competition where there has been a substantial change in employment since the signing of the agreement. *See Sodexo Operations*, 382 F. Supp. 3d at 165 ("Massachusetts courts are hesitant to grant injunctive relief

where the institution of a non-competition provision precedes material changes in the employment relationship…"); *F.A. Bartlett Tree Expert Co.*, 353 Mass. at 587-88; *R.E. Moulton, Inc.*, 2004 WL 1894910, at *1; *Iron Mountain Info. Mgmt., Inc. v. Taddeo*, 455 F. Supp. 2d 124, 132-33 (E.D.N.Y. 2005) (applying Massachusetts law).

As explained above, Russomano's demotion in 2018 resulted in a substantial change in the employment relationship. Therefore, application of New Jersey law to enforce the Non-Compete Agreement against Russomano after such substantial changes would be contrary to a fundamental policy of Massachusetts.

Furthermore, enforcement of the 2016 Agreement against Russomano would be contrary to Massachusetts' public policy against enforcing non-compete agreements where the former employee's new employment does not actually constitute competing. *See Brooks Automation, Inc. v. Blueshift Techs., Inc.*, No. 05-cv-03973-BLS2, 2006 WL 307948, at *7-8 (Mass. Super. Ct. Jan. 17, 2006, Gants, J.) ("Brooks knew that van der Meulen had not joined any company that was actively marketing or selling products in competition with Brooks . . . in the absence of specific language in the non-compete provision that prohibits the employee from preparing to compete . . . a former employee is not barred during the non-compete period from taking steps to prepare to compete with his former employer . . ."). Russomano's employment with BioMarin does not constitute competition with Novo. As discussed in more detail below, BioMarin does not actively sell or market any hemophilia treatment product, and will not do so any sooner than the third quarter of 2020. Because New Jersey courts have not expressed similar policies against enforcement of a non-compete agreement in such circumstances, application of New Jersey law would result in a decision that is contrary to Massachusetts public policy. Therefore, Massachusetts law should apply in deciding the merits of this case. Nevertheless, Russomano

must prevail on Novo's motion under both New Jersey and Massachusetts law, which Novo agrees is not materially different.

**B.     Novo Cannot Establish it is Likely to Succeed on the Merits.**

On a motion for preliminary injunction, the "sine qua non" Novo must establish is its "likelihood of success on the merits." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002).  It cannot, for at least two reasons, make such a showing here.

*1.     Russomano is not Competing.*

Novo cannot show that Russomano has breached—or will ever breach—the 2016 Agreement because the 2016 Agreement does not bar Russomano's employment by a company that does not compete with Novo.  The 2016 Agreement provides that Russomano will not "individually compete, or be employed by, work for, advise, provide services to, or assist in any way *any competitor* of the Company by performing work involving or related to the disease state in which [he] worked or was involved" (emphasis added).  It also states that Russomano may not "individually compete, or be employed by, work for, advise, provide services to, or assist in any way *any competitor* of the Company by working on, or having any involvement or communication with respect to, *products that compete with* or are the same as products that [he] worked on, was involved with, or about which [he] had access to any information, during the last twelve months of [his] employment with the Company." (emphasis added).

BioMarin does not market or sell any Factor VIII replacement therapies, and therefore does not today (and will not) compete with Novo in the factor replacement market. Declaration of John Cones, filed herewith, ¶¶12 ("JC Dec. ¶__").  None of the six BioMarin products approved for use in the United States even treat a disease for which Novo has products they own or market.  *Id.*

BioMarin is not a competitor of Novo. BioMarin's only hemophilia product, Valoctocogene roxaparvovec, is a novel gene therapy that has not been approved by the Food and Drug Administration ("FDA"); the FDA will likely not decide whether or not to grant BioMarin's application for approval until late in the third quarter of 2020. *Id.*, ¶¶16, 17, 22. Until BioMarin's gene therapy is approved by the FDA, BioMarin (and therefore Russomano) cannot actively market or sell it. *Id.*, ¶20. BioMarin does not expect to recognize revenue for gene therapy to treat hemophilia A for many weeks or months after the FDA approves its application. *Id.* Therefore, the work that Russomano will be doing for BioMarin until at least the third quarter of 2020 will not constitute competition against Novo, and cannot be enjoined. *See Brooks Automation*, 2006 WL 307948, at *8 ("If a former employee with a routine one year non-compete agreement cannot even prepare to compete with his former employer during the one year, the effective length of the non-competition period, for all practical purposes, would be significantly longer than one year.").

Novo argues that *Brooks Automation* is inapposite because Russomano will be working for an established company, and will not be starting his own private business, citing *De Long Corp. v. Lucas*, 278 F.2d 804, 809 (2d Cir. 1960). Novo misses that (now) Justice Gants in *Brooks Automation* specifically distinguished its facts from those in *De Long*. Like in *Brooks Automation*, here, the "plain and crucial distinction" is that BioMarin is *not* "actively marketing and selling products in competition" with Novo. Thus, Novo has no basis for seeking enforcement of the 2016 Agreement against Russomano. In short, BioMarin is not a "competitor" under the 2016 Agreement, and it has no "competing product."[3]

_____

[3] Perhaps this is the reason that Russomano's own manager told him several times that he had recommended that Novo not try to enforce the 2016 Agreement. TR Dec. ¶36.

Because of FDA regulation, Russomano will not promote Valoctocogene roxaparvovec before and unless BioMarin obtains FDA approval. *Id.*, ¶32. His first week of employment at BioMarin will focus on general on-boarding and training on BioMarin's systems. *Id.*, ¶33. He will eventually transition to receive internal training relating to general gene therapy research concepts as well as compliance training on how to respond to specific questions from customers regarding BioMarin's not-yet-approved product to ensure that he does not make any statements about unapproved products. *Id.* After this phase of internal training, Russomano's role will focus on general gene therapy research education. *Id.* During this phase, he will communicate with healthcare providers, treatment centers, and advocacy groups about how gene therapy research is being conducted and what the research is seeking to understand. Russomano will neither volunteer nor, if asked, answer any questions about BioMarin hemophilia products before FDA approval. *Id.* The literature Russomano will use and distribute during gene therapy research education will relate to general gene therapy research education, and will not focus exclusively on hemophilia, and will be reviewed and approved in advance by BioMarin's internal compliance department. *Id.*, ¶35. Only if BioMarin's gene therapy treatment is approved by the FDA, would Russomano transition into a role promoting this therapy to health care providers, advocacy groups, and hemophilia treatment centers. *Id.*, ¶36.

Moreover, there is at least a legitimate factual issue respecting whether BioMarin's gene therapy would be considered competitive. Novo's hemophilia drugs treat the condition with regular infusions of pharmaceutical components that replace, in the case of Hemophilia A, clotting Factor VIII. At Novo, that drug is NovoEight,[4] which Russomano himself receives by

---

[4] Although Novo claims in its motion to have two drugs on the market, its second drug, Esperoct, has not yet launched because of intellectual property issues. https://endpts.com/ip-trouble-defers-launch-of-novos-long-acting-hemophilia-therapy/.

infusion every other day.  TR Dec. ¶3.  NovoEight is, in short, a short-term pharmaceutical treatment.

There are about 20 different Factor VIII replacement drugs on the market.  While there are some differences among the Factor VIII replacement products (e.g., storage options such as whether it requires refrigeration and can withstand extreme temperatures), they are substantially similar and are often prescribed based on the doctor's preference and the patient's lifestyle needs.  JC Dec. ¶10.

Gene therapy is a form of treatment designed to address the genetic problem by transferring a functional gene that allows the patient's body to produce its own Factor VIII.  JC Dec. ¶14.  In gene therapy research, a functional gene is inserted into a viral vector.  *Id.*  The viral vector acts as a delivery vehicle, providing the ability to deliver the functional gene to targeted cells.  *Id.*  The cells can then use the gene sequence inside the viral vector to build the functional proteins that the body needs to produce Factor VIII.  *Id.*

The FDA has not yet approved any gene therapies for hemophilia or determined that any gene therapies for hemophilia are safe or effective.  *Id.*, ¶15.[5]  If approved by the FDA, BioMarin's gene therapy will provide qualifying hemophilia A patients with a treatment option that could eliminate the need for regular Factor VIII infusions. *Id.*, ¶17.

In clinical trials, BioMarin's gene therapy treatment consisted of a single intravenous infusion into the patient's body of a genetically engineered vehicle known as a "viral vector" that carries a gene sequence that may allow the patient's body to produce its own Factor VIII.  *Id.*, ¶18.  With the new functioning Factor VIII gene, Valoctocogene roxaparvovec is designed to

---

[5] . The FDA has only approved two gene transfer gene therapies, which treat hereditary blindness and spinal muscular atrophy.  *Id.*

allow the patient's *own liver cells* to begin producing the Factor VIII protein.  *Id.*  Thus,

Valoctocogene roxaparvovec is not a Factor VIII replacement drug; instead it is designed to

transfer a functioning gene to the patient's liver cells, allowing the patient's liver to produce

endogenous Factor VIII, rather than having to infuse exogenous factor replacement therapy to

treat their hemophilia A.  *Id.*

In contrast with Factor VIII replacement drugs, which require intravenous injections

multiple times per week, the Valoctocogene roxaparvovec clinical trial data has shown patients'

Factor VIII levels can remain at a therapeutic level for up to three years after administration, if

not significantly longer. *Id.*, ¶19.

BioMarin estimates, based on the clinical trial protocol submitted to the FDA, that only

about 10% of the hemophilia A population will be eligible for its gene therapy treatment.  *Id.*,

¶21.  For example, the clinical data submitted to the FDA involved only adults and patients with

severe hemophilia A.  *Id.*  Other hemophilia A patients may not qualify for Valoctocogene

roxaparvovec if they have other comorbidities (HIV, hepatitis) or they have an antibody response

to the type of viral vector being used by BioMarin.  *Id.*  Russomano does not dispute that, if it is

enforceable, the 2016 Agreement prevents him from selling clotting Factor VIII replacements

manufactured by other pharmaceutical companies, but that is quite simply not what BioMarin's

gene therapy does. [6]

2.      *The 2016 Agreement Serves No Legitimate Purpose.*

Covenants not to compete are not enforceable unless they serve a legitimate interest of

the employer. *Lombard Med. Tech., Inc. v. Johannessen*, 729 F. Supp 2d 432, 438 (D. Mass.

---

[6] Novo's citation to *Elizabeth Grady Face First, Inc. v. Escavich*, 321 F. Supp. 2d 420, 423 (D. Conn. 2004), trivializes the significant differences between gene therapy and its own treatments.

July 2, 2010); *Whitmyer Bros., Inc. v. Doyle*, 58 N.J. 25, 274 A.2d 577, 581 (N.J. 1971) (non-compete must serve a legitimate interest of employer).  Courts consider an employer to have a legitimate business interest in protecting trade secrets, confidential information, and the employer's good will acquired through dealings with customers.  *Whitmyer*, 274 A.2d  at 581.  "Courts will not enforce non-competition agreements meant solely to protect employers from run-of-the-mill business competition."  *Lombard*, 729 F. Supp. 2d at 438.; *see Whitmyer*, 274 A.2d at 581 ("The employer has no legitimate interest in preventing competition . . . .").

Here, Novo has no legitimate interest in enforcing the 2016 Agreement.  Russomano did not acquire, and did not even have access to, Novo's trade secrets or confidential information.  TR Dec. ¶45.  Although Novo adverts to concerns about Russomano's access to its confidential information, Novo waited more than a week to even reach out to Russomano regarding the return of its property which was in his possession upon his resignation, and as of this date, it has still retrieved nothing other than his company car.  *Id.*, ¶37.  And because BioMarin's product, if it is approved, is vastly different from NovoEight, BioMarin would not benefit from having access to any Novo information, even if Russomano had such information.   Moreover, knowledge or information about Novo's customer base is public knowledge.  A simple Google search would reveal the various hospitals, hemophilia treatment centers, or specialty pharmacies to which Russomano sold or marketed Novo's products.  This information does not require the protection of a non-compete provision.  *See Whitmye*r, 274 A.2d at 581 ("[M]atters of general knowledge within the industry may not be classified as trade secrets or confidential information entitled to protection . . . .").

To the extent that the Court finds that the 2016 Agreement is valid, it contains both non-solicitation and non-disclosure provisions that adequately protect Novo.  Specifically, Section

3(c) states that Russomano will not "solicit, induce, or encourage, or attempt to solicit, induce or encourage any officer, manager, employee, or consultant of the Company to leave the Company via verbal or written communication, including social media, to be hired for any work or employment by any other person or entity, whether or not such persons would commit a breach of contract of employment by reason of leaving the service of the Company." Section 2(a) provides that Russomano will not "during the term of [his] employment or at any time thereafter, use for [his] own benefit, or communicate or disclose to, or use directly or indirectly for the benefit or any person . . . or entity, any of the Confidential Information . . . ." Therefore, if the Court finds that the Non-Compete Agreement is valid, it should also find that the non-solicitation and non-disclosure provisions in the 2016 Agreement adequately protect Novo's trade secrets and confidential information. *See Edwards v. Athena Capital Advisors, Inc.*, 23 Mass. L. Rptr. 155, 2007 WL 2840360, at *4 (Mass. Super. Ct. 2007) (confidentiality and non-solicitation clauses were adequate to protect employer's goodwill and confidential information). Russomano agreed in his Complaint to abide by those provisions.

In this regard, it bears noting that Russomano has *no documents* responsive to the four document requests proposed by Novo for expedited discovery that are directed to him except a new hire checklist, in which he confirmed that he would not "use or disclose confidential, proprietary or trade secret information belonging to any former employer" "in connection with [his] employment with BioMarin Pharmaceutical." TR Dec. ¶¶47-49.[7]

---

[7] Those request seek all documents concerning:

- any material or information of any kind, including any trade secrets, proprietary or confidential information, or other business information, of Novo Nordisk that was provided to BioMarin by Plaintiff;

- communications between BioMarin and Plaintiff, concerning Novo Nordisk, its trade secrets, its proprietary or confidential information, any of its other business information, or the potential employment of Plaintiff;

- BioMarin's communications with James Stephens concerning Plaintiff;

3.     *Russomano's Good Will in the Hemophilia Community is His Own.*

As mentioned above, an employer may have a legitimate business interest in protecting its good will.  But a non-competition clause is "designed to protect the employer's good will, not to appropriate the good will of the employee." *Routhier Placement Specialists, Inc. v. Brown*, 15 Mass. L. Rptr. 246, 2002 WL 31248032, at \*2 (Mass. Super. Ct. Sept. 26, 2002).  An employer "is not entitled to rely upon the good will that belongs to [the employee], even if [the employee] strengthened her personal skills" while employed by the employer. *Id; see also Edwards*, 2007 WL 2840360, at \*3 ("Sales and marketing skills that are developed on the job are considered general and ordinary skills."); *Coskey's Television & Radio Sales and Service, Inc. v. Foti*, 253 N.J. Super. 626, 637 (App. Div. Feb. 19, 1992) ("An employer may not prevent an employee from using the general skills in an industry which have been built up over the employee's tenure with the employer.").

Russomano has hemophilia himself, and was active in the hemophilia community outside of his employment with Novo for at least 15 years.  TR Dec. ¶¶2-7.  He currently volunteers as lead counselor for the New England Hemophilia Association Family Camp's Adventure Club, a program for 13-15 year-olds, and as recently as January 18-20 presented with the camp director at the North American Camping Conference of Hemophilia Organizations. *Id.*, ¶¶5-6.  He served as a Board Member at the Hemophilia Federation of America for six years, and in various positions, including 1st Vice President, of the Hemophilia Association of New Jersey for eleven years prior to his employment by Novo. *Id.*, ¶7.  Not only is Russomano personally involved as a patient within the hemophilia community, but he is also well-respected.  For example, the

---

- communications between Plaintiff and James Stephens concerning employment or potential employment with BioMarin.

Hemophilia Association of New Jersey awarded Russomano with an award for service in May 2016. *Id.* Any good will that Russomano developed and maintains in the hemophilia community is absolutely his own. Novo therefore has no legitimate business interest in attempting to appropriate Russomano's reputation in and commitment to the hemophilia community. At most, Russomano acquired from Novo general training on sales and marketing, applicable to any medical setting. Because Novo lacks a legitimate business interest in enforcing the 2016 Agreement to protect trade secrets, confidential information, or good will, it therefore is unlikely to succeed on the merits.

### III.    There is No Risk of Irreparable Harm

Novo's motion should also be denied because it cannot show that it will suffer irreparable injury if the injunction is not granted. To demonstrate an irreparable injury, Novo must show that it has no adequate remedy at law, i.e., that money damages would not fully repair the harm. *Ruggieri v. M.I.W. Corp.*, 826 F. Supp. 2d 334, 336 (D. Mass. 2011). "Irreparable harm requires 'an actual, viable, presently existing threat of serious harm.'" *Bio-Imaging Techs., Inc. v. Marchant*, 584 F. Supp. 2d 322, 330 (D. Mass. 2008) (quoting *Sierra Club v. Larson*, 769 F.Supp. 420, 422 (D. Mass. 1991).). Demonstrating irreparable harm is a heavy burden to overcome. *See 4 MVR, LLC v. Warren Hill Const. Co., Inc.*, No. 12-10764, 2012 WL 3016223, at *5 (D. Mass. July 23, 2012). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Biogen Idec MA Inc. v. Trustees of Columbia Univ.*, 332 F. Supp. 2d. 286, 296 (D. Mass. 2004) (quoting *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004)).

Here, Novo's conduct belies any risk of irreparable harm. Russomano notified his manager by phone on January 6 that he was resigning and joining BioMarin. He confirmed that intention with a letter the same day, asking Novo to confirm he was free to do so. Novo did not respond until January 8, when it sent a letter asserting that the 2016 Agreement prohibited Russomano from joining BioMarin. That same day, Russomano's counsel provided a copy of his Complaint to Novo's counsel. Novo took no action for a full week, removing the Complaint on January 15 and requesting a meet and confer that same day. The parties conferred at 3:00 on January 15, but Novo did nothing until January 21. Novo has still not even collected its hardware or other materials from Russomano. TR Dec. ¶37. Those are not the actions of a party that is concerned it will suffer irreparable harm. *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 163 (1st Cir. 2004) (unexplained "delay between the institution of an action and the filing of a motion for preliminary injunction…detracts from the movant's claim of irreparable harm."); *Alexander & Alexander, Inc. v. Danahy*, 21 Mass. App. Ct. 488, 494-95, 488 N.E.2d 22 (1986) ("Unexplained delay in seeking relief … may indicate an absence of irreparable harm and may make an injunction based upon that conduct inappropriate.").

Any injury claimed by Novo cannot plausibly be characterized as "existing" given the nature of Russoamno's role at BioMarin, his job responsibilities, and the uncertainty associated with FDA approval of BioMarin's gene therapy. As is described above (pp. 9-10), Russomano's employment at BioMarin will begin with *internal* training relating to gene therapy generally, as well as training regarding how to respond to specific questions from customers regarding BioMarin's not-yet-approved product to ensure that he does not make any statements about the efficacy of any specific unapproved gene therapy.

He cannot, and will not, turn to any specific discussion about BioMarin's gene therapy unless that therapy is approved by the FDA, late in the third quarter of 2020, and possibly even later than that. JC Dec. ¶¶32-34. Russomano will not disparage Novo's products,[8] and until approval he will not promote BioMarin's work in gene therapy for hemophilia.

If, and only if, BioMarin's gene therapy treatment is approved by the FDA, Russomano will transition into a role promoting this therapy to prescribers and hemophilia treatment centers in New England. *Id.,* ¶36. Approval, if it occurs at all, may occur after the expiration of the term of the 2016 Agreement. This is not a presently existing threat of serious harm. Novo cannot carry its burden of showing why Russomano's engaging in weeks of internal training, followed by months educating the community regarding a new scientific technique that Novo does not use, would cause it irreparable injury.

## IV.    Balance of Harms Favors Russomano

As outlined above, Novo faces no harm if Russomano works at BioMarin. Russomano, however, faces significant harm. "In assessing the equities in favor of a party opposing an injunction, we once again look not to the degree of injury alone, but rather to the risk of harm in view of the party's chance of success on the merits." *Packaging Indus. Group, Inc. v. Cheney*, 380 Mass. 609, 405 N.E.2d 106, 114 (1980). In applying this sliding scale analysis, given that Novo has failed to show that it is more likely than Russomano to succeed on the merits of the case, Novo bears a higher burden to show that the balance of harms is in its favor. It cannot make such a showing.

Novo has not set forth any evidence that it will be harmed—none of its trade secrets, confidential information, or good will are at risk. Russomano has made every effort to diligently

---

[8] The FDA prohibits comparisons between two treatments absent direct clinical support. 21 C.F.R. 202.1(e)(6)(ii).

return all of his company materials and has had no access to Novo's confidential information to begin with. Russomano's relationships with the hemophilia community are preexisting, and in any case will be of diminished importance given the nature of his new role at BioMarin.

Russomano, however, faces substantial harm if the preliminary injunction is granted. To be sure, his four years at Novo were hardly a hallmark of stability. His position was eliminated twice, in 2016 (after he had been with the company less than a year) and in 2018, with the latter elimination resulting in completely new job responsibilities, extensive travel away from home, and a decrease in overall available compensation. TR Dec. ¶¶13-30. He was so dissatisfied, particularly with the travel requirement (after moving to Boston for Novo), that he applied for at least one other position in Novo that would require less travel, but Novo rebuffed his efforts, instead expanding his territory in way that would take him away from home even more often and adding new job responsibilities, all without restoring his compensation to what it was before his position was eliminated in 2018. *Id.* Throughout this time, he watched Novo's sales force shrink, from a headcount of about 45 in 2016 to about 30 at the time of his resignation. *Id.*, ¶40.

The 2016 Agreement does not provide for payment of benefits such as health insurance, which would impose a significant financial burden on Russomano and impact his ability to get the hemophilia treatment he needs. *Id.*, ¶¶42-45. Moreover, Russomano's incentive compensation was a significant portion of his income at Novo, and without it, his family, which is expecting a second child in August of this year, would face a significant financial hardship. *Id.* When weighed against the speculative harm alleged by Novo, the harm that Russomano and his family will most certainly face is much greater. *See Genzyme Corp., et al. v. Keith Hanglin and BioMarin Pharm., Inc.*, No. 19:84-cv-03502-BLS2, at *4 (Mass. Super. Ct. Nov. 19, 2019) (balance of harms favored employee who was primary breadwinner for his family and employer

could not show specific confidential information that was at risk); *see also Edwards*, 2007 WL 2840360, at *4 (employee's interest in earning a living outweighed employer's "speculative interest in protecting its investment in training its employees, or in avoiding adverse competition."). The balance of relative hardships favors Russomano.

## IV. Granting a Preliminary Injunction Would Disserve the Public Interest

Granting a preliminary injunction here will disserve the public interest. Russomano has lived with hemophilia his entire life, and has spent years building relationships within the hemophilia community. In fact, Russomano's personal experience with hemophilia is likely what made him an attractive candidate for the position at Novo. He has since developed a career in field of the disease state from which he suffers, and he is able to make an impact for his fellow hemophilia patients every day. Russomano's new position with BioMarin would allow him to educate doctors about a revolutionary type of treatment—gene therapy—and, eventually, will allow him to promote a potentially life-changing treatment for those suffering from hemophilia.

Finally, to prohibit Russomano from working for BioMarin where Novo has no legitimate business interest to protect would be contrary to the public interest in promoting professional development and fair competition. *See Edwards*, 2007 WL 2840360, at *3 ("An employee's right to sue his or her 'general knowledge, experience, memory and skill' promotes the public interest in labor mobility and the employee's freedom to practice his or her profession, as well as limiting what would otherwise be a restraint of legitimate competition."). Thus, Novo fails the fourth and final factor of the preliminary injunction analysis, and Novo's motion must be denied.

## CONCLUSION

For the foregoing reasons, Russomano respectfully requests that this Court deny Novo's Motions for a Temporary Restraining Order and for Expedited Discovery.

Dated:  January 21, 2020

Respectfully submitted,

*/s/ Christopher M. Morrison*
Christopher M. Morrison (BBO#651335)
Jenna L. LaPointe (BBO#699045)
JONES DAY
100 High Street, 21st Floor
Boston, MA 02110
Telephone: (617) 449-6895
Facsimile:  (617) 449-6999
Email:  cmorrison@jonesday.com
          jlapointe@jonesday.com

*Attorneys for Plaintiff Thomas A. Russomano*

**<u>Certificate of Service</u>**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on January 21, 2020.

<u>/s/ Christopher M. Morrison</u>